UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW LOPEZ,
Plaintiff,
v.
M. LEE, et al.,
Defendants.

Case No. 23-cv-03660-HSG

**ORDER DENYING PLAINTIFF'S REQUEST FOR SPOLIATION SANCTIONS; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; REFERRING CASE TO PRO SE PRISONER MEDIATION PROGRAM**

Re: Dkt. Nos. 88, 89, 95

Plaintiff, an inmate currently housed at San Quentin Rehabilitation Center ("SQRC"), has filed a *pro se* civil rights action. This order addresses (1) Plaintiff's motion for summary judgment, Dkt. No. 88; (2) Plaintiff's request for spoliation sanctions, Dkt. No. 89; and (3) Defendants' motion for summary judgment, Dkt. No. 95. For the reasons set forth below, the Court DENIES Plaintiff's motion for summary judgment, Dkt. No. 88; DENIES Plaintiff's request for sanctions, Dkt. No. 89; DENIES Defendants' motion for summary judgment, Dkt. No. 95; and REFERS this action to Magistrate Judge Robert Illman for settlement proceedings pursuant to the Pro Se Prisoner Mediation Program.

## BACKGROUND

### I. Complaint

Plaintiff has sued Pelican Bay State Prison ("PBSP") officers S. Cupp, Hamner, Cross, M. Lee, Brewer, and K. Davis, alleging that between May 2020 and March 2021, while he was housed in Restricted Custody General Population ("RCGP"), Facility B-1, they retaliated against him for his grievance activity by denying or limiting his access to phone, yard, shower, and out-of-

United States District Court
Northern District of California

United States District Court
Northern District of California

cell time. *See generally* Dkt. Nos. 1, 12. In the complaint, Plaintiff specifies the dates that each individual defendant denied him access to phone, yard, shower, or out-of-cell time. *See generally* Dkt. No. 1; *see, e.g.,* Dkt. No. 1 at 17 (defendant Lee denied Plaintiff phone time on January 11-15, 2021; defendant Hamner denied Plaintiff phone time on January 17, 2021).

The Court screened the complaint as follows:

> Liberally construed, the complaint states cognizable First Amendment retaliation claims against defendants Cupp, Ham[n]er, Cross, Lee, Brewer, and Davis because it alleges that, on certain dates, these defendants denied Plaintiff phone calls, limited his phone calls to unfavorable times, rescheduled his shower time to an inconvenient time, told other inmates that their phone privileges would be limited because of Plaintiff's grievance activity, forced him to end his call early, and refused to allow him to stay outside his cell; and specified that the restrictions were because of Plaintiff's filing activity. Specifically, the following allegations state cognizable First Amendment retaliation claims:
>
> - On May 28, 2020, defendant Cupp told Plaintiff that if he wanted to file grievances, he could no longer have calls during work[] hours and would miss calls if he went to yard, and told other inmates that they would be denied phone calls during work hours because of Plaintiff's grievance activity;
> - On June 3, 2020, defendant Ham[n]er told Plaintiff that he must skip yard if he wanted to use the phone, stating that he did so at defendant Cupp's direction;
> - On December 9, 2020, defendant Lee cut short Plaintiff's c[a]ll, and later told Plaintiff on December 29, 2020 that he would run the call program the way he wanted and that Plaintiff should "keep filing;"
> - On August 15, 2020, defendant Cross skipped Plaintiff for call time, stating that he made a new rule and referencing Plaintiff's grievance activity;
> - On January 20, 2021, defendant Brewer restricted Plaintiff's call time, telling him to "keep filing," and defendant Lee told the inmates in Cell 101 that they would not get call time because of Plaintiff's grievance activity; and
> - On March 27, 2021, defendant Davis told the porters no more double calls because of Plaintiff's grievance activity.
>
> In addition, the allegations that defendants Lee and Ham[n]er repeatedly denied Plaintiff phone calls, out-of-cell time, and shower time on other days and indicated knowledge of, and irritation with, Plaintiff's grievance activity state cognizable First Amendment retaliation claims. The allegations that defendants Cupp, Ham[n]er, Cross, Lee, Brewer, and Davis failed to respond to, or improperly handled, Form 22s or grievances regarding alleged mistreatment or failure to comply with prison regulations or state laws do not state a First Amendment retaliation claim because a prison official's denial of an inmate's grievance generally does not constitute significant participation in an alleged constitutional violation sufficient to give rise to personal liability under Section 1983. Liberally construed, the allegations that defendants Cupp, Ham[n]er, Cross, Lee, Brewer, and Davis threatened to deprive Plaintiff of phone calls, out-of-cell time, or showers because of his grievance activity also state a cognizable claim for violation of the Bane Act. *See Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 66, *as modified on denial of reh'g* (Cal. Ct. App. 2015).

Dkt. No. 12 at 6-7. The Court specifically dismissed the complaint's allegations that PBSP correctional officials mistreated him or failed to follow prison regulations or memorandums for

failure to state a claim. Dkt. No. 12 at 4-5.

The Court's screening order therefore limited Plaintiff's cognizable claims against Defendants in scope and time as follows:

*Defendant Brewer*: access to phone on January 20, 2021.

*Defendant Cupp*: access to phone on May 28, 2020.

*Defendant Davis*: access to phone on March 20 and 27, 2021.

*Defendant Hamner*: (1) access to phone on June 2, 2020, June 3, 2020, January 17, 2021, January 24, 2021, February 7, 2021, February 10, 2021, February 28, 2021, and March 13, 2021; (2) access to shower on September 9, 2020; and (3) access to yard on June 2, 2020 and June 3, 2020.

*Defendant Lee*: (1) access to phone on December 9, 2020, December 29, 2020, January 7, 2021, January 11-15, 2021, January 18, 2021, January 21, 2021, January 26, 2021, January 27, 2021, February 2, 2021, February 4, 2021, February 8-10, 2021, February 23, 2021, March 3-4, 2021, March 11, 2021, March 15, 2021, March 18, 2021, April 6-8, 2021, April 13, 2021, April 18, 2021, and May 3, 2021; (2) access to shower on January 27, 2021, February 4, 2021, March 18, 2021, April 8, 2021, and April 13, 2021; and (3) access to dayroom on January 27, 2021, March 18, 2021, April 8, 2021, April 13, 2021, and April 21, 2021.

## II. Factual Background

The following facts are undisputed unless otherwise noted.

### A. Restricted Custody General Population ("RCGP")

Inmates are housed in Restricted Custody General Population ("RCGP") if they cannot be housed in general population ("GP") or the sensitive needs yard ("SNY") because of safety concerns. Kirby Decl., ¶ 5 (Dkt. No. 95-8 at 2). Some of the inmates were affiliated with gangs, some were sex offenders, and some had enemy concerns with inmates in the same housing unit. Kirby Decl., ¶ 6 (Dkt. No. 95-8 at 2). As a result, the RCGP had different programming than the GP, with extra precautions in place. Kirby Decl., ¶ 6 (Dkt. No. 95-8 at 2). For example, unless inmates preferred to be on walk-alone status, each inmate was assigned to group with approximately 6-8 other inmates with whom they did not have any enemy concerns. Kirby Decl., ¶

6 (Dkt. No. 95-8 at 2). Each group programmed together, meaning that they attended dayroom, yard, canteen, and classes together. Kirby Decl., ¶ 6 (Dkt. No. 95-8 at 2). Prison rules prohibited the intermingling of RCGP inmates with inmates with whom they had safety and security concerns, and with GP inmates. Kirby Decl., ¶ 7 (Dkt. No. 95-8 at 2). Security concerns prohibited certain programs from operating at the same time. Ruhparwar Decl., ¶ 7, Ex. D, pp. 8-9.

### B. Phone Access for RCGP Inmates

Prior to the COVID pandemic, the CDCR Operations Manual ("DOM") set forth the following rules regarding inmate access to phone calls. The telephone program was offered on both Second Watch (6:00 am – 2:00 pm) and Third Watch (2:00 pm – 10:00 pm). DOM 52060.1 (Dkt. No. 95-8 at 7). Telephone calls were limited to 15 minutes and allowed only during an inmate's non-working/non-training hours. Dkt. No. 95-8 at 7, 8. With respect to sign-up sheets, the DOM states as follows:

> Telephone sign-up sheets will be maintained in the housing unit control booths. A copy of the completed telephone list reflecting inmates who have actually made telephone calls, including the time the calls were made and the inmate's California Department of Corrections and Rehabilitation (CDCR) identification number, will be forwarded to the Security Squad daily. Routing will be the responsibility of Third Watch staff. Original telephone lists will be retained by the respective facility.

Dkt. No. 95-8 at 7. With respect to Level IV General Population inmates, the DOM provided as follows:

> The telephone program will be offered on both Second and Third Watch. Inmates will be allotted 15 minutes of telephone time and will be permitted one entry on the telephone sign-up sheet per day in accordance with the Inmate Telephone Sign-Up Sheet (Attachment A).
>
> During Second Watch, the telephone program will occur in all housing units during the morning yard period. Inmates will be allowed to sign up for telephone calls in lieu of going to yard. Once placed on the telephone list for Second Watch call, the inmate will remain in the housing unit in order to be available at their scheduled time.
>
> During Third Watch, telephone calls will commence at 1445 hours, with the last call being initiated at 2030 hours. During evening dayroom program, telephone calls will be conducted only in the active section currently running dayroom. Telephone calls shall not be conducted in other sections while a dayroom is active. At the conclusion of the dayroom program, telephone calls may resume in all three sections until concluded at 2045 hours. Telephone calls will be conducted on a rotational basis within each section. Rotation will be clockwise from cell to cell, starting each day where the previous day ended.

Dkt. No. 95-8 at 7. The DOM further provided that RCGP would be provided a minimum of two

phones call a week, and that Privilege A inmates could sign up for one telephone period a day, while Privilege B inmates were limited to one telephone period per month and Privilege C and D inmates could only make telephone calls on an emergency basis. Dkt. No. 95-8 at 7-8. On November 21, 2019, PBSP Warden Robertson advised correctional officers that they must use an updated version of the phone sign-up sheet and attached a copy of the revised sheet. Dkt. No. 95-8 at 12-13. Defendants state that inmate access to the telephone was limited by various factors, including, for example, other inmates' rights to use the phones, safety and security concerns for inmates and staff, modified programs, the inmate's work hours, med pass, dinner, count time, staff shortages, staff needing to respond to incidents happening on the yard or inside the building, and the functionality of the phones in the dayroom. Brewer Decl., ¶ 10 (Dkt. No. 95-3 at 2-3); Hamner Decl., ¶ 12 (Dkt. No. 95-4 at 3); Lee Decl., ¶ 9 (Dkt. No. 95-5 at 2); Cupp Decl., ¶ 11 (Dkt. No. 95-6 at 2-3); Davis Decl., ¶ 15 (Dkt. No. 95-7 at 3); Kirby Decl., ¶ 12 (Dkt. No. 95-8 at 4).

Plaintiff alleges that in his experience "of more than 30 years' incarceration at numerous prisons," phone access is allocated by correctional officials preparing a sign-up sheet and allowing inmates to sign up based on their privilege group, with the highest privilege group allowed to choose the time slots that best fit their circumstances, the lower privilege groups signing up after the privilege groups above them, and the highest privilege groups afforded the opportunity to sign up for any remaining slots. Dkt. No. 1 at 10. Plaintiff further argues that the DOM §§ 52060.1, 52060.5-52060.7, the RCGP Handbook at p.6 § H, and a November 21, 2019 PBSP Memorandum required correctional officials to allocate phone time by using a sign-up sheet; required correctional officials to allow inmates with higher privilege status to sign up first so that higher privilege status inmates have access to the prime time slots; and did not require an inmate to choose between yard and phone time. Dkt. No. 89 at 3-4, 29. Defendants state that prison regulations at the time did not require control booth officers to create sign-up sheets to allocate phone access for inmates in housing unit B-1 and that control booth officers could determine if inmates wanted to use the phones by asking each inmate through the window of the control booth by on a rotational basis if they wanted to use the phone. Brewer Decl., ¶ 11 (Dkt. No. 95-3 at 3); Hamner Decl., ¶ 13 (Dkt. No. 95-4 at 3); Lee Decl., ¶ 10 (Dkt. No. 95-5 at 2); Cupp Decl., ¶ 12

(Dkt. No. 95-6 at 3); Davis Decl., ¶ 16 (Dkt. No. 95-7 at 3); Kirby Decl., ¶ 13 (Dkt. No. 95-8 at 4).

The Court has reviewed the sources cited by Plaintiff and finds no support for Plaintiff's conviction that correctional officers were required to use sign-up sheets to allocate phone time and required to allow higher privilege inmates priority access to phone time. Prison regulations allowed for both the use of a sign-up sheet to allocate phone time and for phone calls to be conducted on a rotational basis. The only requirements with respect to the signup sheet were that the sheets were to be maintained in the housing unit control booths, correctional officials were required to log the phone calls made by inmates, and inmates were allowed only one entry on the sheet. The DOM specifies that higher privilege groups had more phone time but does not instruct correctional officials to give higher privilege inmates, or any inmates, priority in accessing the phone.

According to Defendants' declarations and the depositions of various inmates, during the relevant time, correctional officers frequently did not use a sign-up sheet and instead allocated phone access by asking each inmate, through the window of the control booth, on a rotational basis if they wanted to use the phone. Brewer Decl., ¶ 11 (Dkt. No. 95-3 at 3); Hamner Decl., ¶ 13 (Dkt. No. 95-4 at 3); Lee Decl., ¶ 10 (Dkt. No. 95-5 at 2); Cupp Decl., ¶ 12 (Dkt. No. 95-6 at 3); Davis Decl., ¶ 16 (Dkt. No. 95-7 at 3); Kirby Decl., ¶ 13 (Dkt. No. 95-8 at 4); Pinkham Dep. 38:13-38:16 (Dkt. No. 88-2 at 15) ("I don't recall a phone sign-up list."); Simms Dep. 20:20-20:24 (Dkt. No. 88-2 at 24) ("There was a phone list but if I remember correctly, everyone agreed to just pop the doors one at a time or group at a time and go down the line or start from this side to that side."); Foster Dep. 21:8-22:7 (Dkt. No. 88-2 at 36) ("[The phone list] was generated in different methods at different times and different sections . . there was even a time when no list was generated."); Grajeda Dep. 34:18-34:21 (Dkt. No. 88-2 at 50) ("There was supposed to be [a phone list], and [defendant Lee] was supposed to follow it according to, but he didn't"); Guzman Dep. 51:7-52:18 (Dkt. No. 88-2 at 112). When a signup sheet was used, it was often inmate porters, and not correctional officials, who generated the list. Grajeda Dep. 34:18-35:17 (Dkt. No. 88-2 at 50); Guzman Dep. 51:7-52:15 (Dkt. No. 88-2 at 112).

The record supports Plaintiff's claim that, notwithstanding the regulations, during the

relevant time period, correctional officers regularly allowed inmates to both attend yard and have phone time on the same day and allowed inmates to make multiple phone calls regardless of privilege group. Pinkham Dep. 43:1-43:20 (Dkt. No 88-2 at 16) (witness testifying that he could make multiple calls depending on circumstances), 46:10-47:2 (testifying that the rule that if you went to yard you could not use the phone was a "made up rule," and recalling having phone time and yard the same day); Sims Dep. 34:1-34:4 (Dkt. No. 88-2 at 25) ("Q: So if you signed on a phone list and it was during your yard time, you had to stay in. Approximately how many times did that happen to you? A: None."); Foster Dep. 31:22-32:4 (testifying to receiving yard and phone calls during the same day, and being able to make multiple phone calls during same day); Hartman Dep. 47:21-48:13 (Dkt. No. 88-2 at 127). Phone sign-up sheets for early January 2021 show multiple inmates making calls twice a day and occasionally three times a day. Dkt. No. 95-2 at 128, 131, 132, 135.

During the COVID pandemic, both the CDCR and PBSP issued memorandums allowing greater phone access for inmates. The following memorandums were applicable to RCGP inmates.

On March 24, 2020, the CDCR issued a memorandum instructing wardens "to find opportunities to allow increased phone access for the incarcerated population so they may keep in touch with their support system, while also practicing social distancing and other infectious disease safety protocols." Dkt. No. 95-8 at 16. The memorandum did not specify how the wardens should increase phone access. Dkt. No. 95-8 at 16.

On April 4, 2020, PBSP Warden Robertson issued a memorandum temporarily lifting the limit of one phone call per day. Dkt. No. 95-8 at 18. Warden Robinson instructed that if an inmate wanted to sign up for additional phone time after the rest of the housing unit had been afforded the option of signing up for a time slot, the prison would accommodate the request unless there were overriding factors that would preclude the request. Dkt. No. 95-8 at 18.

On September 10, 2020, RCGP Facility B Captain Betzinger issued another memorandum clarifying that Privilege Group A inmates were permitted to sign up for an additional daily phone time slot after the rest of the section had been afforded the option to sign up for their time slots,

and that staff should accommodate the additional slot unless there were overriding factors. Dkt. No. 95-8 at 28. The memorandum further specified that all telephone calls should be made during the inmates non-working and non-training hours, and that RCGP inmates could sign up for phone slots on a rotational basis on an interim sign-up list, with the interim list considering the RCGP's specific additional security needs. Dkt. No. 95-8 at 28.

On March 4, 2021, PBSP Facility B Captain Lacy issued a memorandum that directed, in relevant part, that RCGP Privilege Group A inmates continue to be allowed to sign up for an additional phone time slot after the rest of the unit's section had been afforded a chance to sign up unless there were overriding factors; that the telephone program would be facilitated daily on Third Watch, and also on Second Watch on weekends and holidays; that all telephone calls were to be made during the inmate's non-working and non-training hours; and that an interim RCGP telephone sign-up sheet would be used to permit inmates to sign up for phone slots on a rotational basis. Dkt. No. 95-8 at 28.

On April 16, 2021, Associate Warden Pepiot issued a memorandum notifying staff that RCGP inmates' phone access returned to the policies set forth in the DOM. Dkt. No. 95-8 at 34.

**C. Inmate Access to Yard, Dayroom, and Shower**

Inmates in Privilege Groups A and B have access to yard, recreation, and entertainment activities during their non-working and training hours, with the only limitation being the institution's security needs. Dkt. No. 88-2 at 141-42. In contrast, inmates in Privilege Groups C and D have access to yard but do not have access to recreation or entertainment activities. Dkt. No. 88-2 at 141-43. There is nothing in the record indicating if there were prison regulations governing inmate access to showers.

**D. Defendants' Job Responsibilities**

During the relevant time period, Defendants held the following jobs at Pelican Bay State Prison.

*Program sergeants Brewer and Cupp*. Defendant Brewer worked as a Program Sergeant in Plaintiff's housing unit from April 27, 2020 until March 5, 2023. Dkt. No. 95-3 at 2. Defendant Cupp worked as a Program Sergeant in Plaintiff's housing unit in 2020 and 2021. Dkt.

United States District Court
Northern District of California

No. 95-6 at 2. Defendants Brewer and Cupp described their duties and responsibilities pertaining to inmate phone access as follows. They enforced all departmental rules pertaining to inmate phone access, supervised floor officers and control booth officers enforcing departmental rules governing inmate phone access, and addressed any problems about inmate phone access raised by inmates, floor officers, and control booth officers. Dkt. No. 95-3 at 2; Dkt. No. 95-6 at 2. Program sergeants were not responsible for, or able to, release inmates from their cell to access the phone. Dkt. No. 95-3 at 2; Dkt. No. 95-6 at 2.

*Correctional officers Hamner and Lee*. In 2020 and 2021, defendants Hamner and Lee worked as correctional officers in the control booth in Plaintiff's housing unit. Dkt. No. 95-4 at 2; Dkt. No. 95-5 at 2. Defendants Hamner and Lee state that, in this capacity, their duties and responsibilities with respect to RCGP Unit B-1 inmates were as follows. With respect to phone access, defendants Hamner and Lee activated and deactivated the dayroom phones, released inmates from their cells to access these phones, monitored calls, ensured that calls remain within the allowed timeframe, and maintained a list identifying inmates who had calls and the times of these calls. Dkt. No. 95-4 at 2; Dkt. No. 95-5 at 2. The applicable policies and procedures did not require control booth officers to create sign-up sheets to allocate phone access for B-1 inmates. Dkt. No. 95-4 at 2; Dkt. No. 95-5 at 2. Control booth officers could determine if inmates wanted to use the phones by asking each inmate on a rotational basis if they wanted to use the phone. Dkt. No. 95-4 at 2; Dkt. No. 95-5 at 2. With respect to shower access, defendants Hamner and Lee released inmates for showers as follows. If defendants Hamner and Lee worked Second Watch, they generally started releasing inmates for showers by rotating through inmates' cells. Dkt. No. 95-4 at 3; Dkt. No. 95-5 at 3. If defendants Hamner and Lee worked on third watch and control booth officers during Second Watch had not finished rotating through the cells, they would continue the rotation. Dkt. No. 95-4 at 3; Dkt. No. 95-5 at 3. For safety reasons and in compliance with prison regulations, defendants Hamner and Lee generally only released one or two inmates at a time. Dkt. No. 95-4 at 3; Dkt. No. 95-5 at 3. With respect to yard access, defendants Hamner and Lee generally enabled inmates to go on the yard with inmates in their designated group. Dkt. No. 95-4 at 3; Dkt. No. 95-5 at 3.

### E. Alleged Acts of Retaliation[1] and Related Factual Allegations

From May 2020 through May 4, 2021, Plaintiff was housed in PBSP RCGP Facility B-1, Section A. Dkt. No. 89 at 29. Plaintiff worked as a barber in his housing unit and was assigned to Privilege Group A-1-A, the highest privilege earning group. Dkt. No. 1 at 9; Dkt. No. 89 at 31; Davis Decl., ¶¶ 7, 13 (Dkt. No. 95-7 at 2). Facility B-1 has two tiers, with twelve cells on each tier. Dkt. No. 1 at 9. During the relevant time period, many of these cells were unoccupied and the occupied cells had only one inmate. Dkt. No. 1 at 9. Plaintiff was housed on the first tier, in Cell No. 104. Dkt. No. 1 at 13-14. In March 2021, there were approximately 40-60 inmates in Plaintiff's housing unit and around 15-20 inmates in B-1. Davis Decl., ¶ 5 (Dkt. No. 95-7 at 2). Plaintiff needed to make phone calls on the early side because late calls did not work for his supporters due to various reasons, including their advanced age. Dkt. No. 89 at 17. Plaintiff was known to frequently file grievances and considered a jailhouse lawyer. Dkt. No. 88-2 at 94, 108, 114.

The COVID pandemic affected inmate phone access as follows. From March 2020 to April 2021, prison officials afforded inmates the opportunity to make additional phone calls beyond what was normally allowed for their privilege group and housing status. Dkt. No. 95-8 at 15-34. The COVID pandemic affected Plaintiff's job as follows. In March 2020, the inmate barber program was suspended. In September 2020, the inmate barber program was resumed but modified. In late 2020, Plaintiff worked fewer hours than he had in the months prior to the COVID pandemic. Dkt. No. 88-1 at 84-85, 91.

Defendants state that prison phone records indicate that Plaintiff was provided phone access as follows: (1) Plaintiff had thirteen phone calls between January 1 to January 9, 2021, Dkt. No. 95-2 at 142; (2) Plaintiff had three documented phone calls on January 6, 2021, Dkt. No. 95-2 at 142; (3) Plaintiff was offered a phone call on January 7, 2021, Dkt. No. 95-2 at 142;

---

[1] Plaintiff's summary judgment motion and related briefing and Plaintiff's opposition to Defendants' summary judgment motion raise claims that the Court has already dismissed for failure to state a claim. Specifically, Plaintiff's pleadings again allege instances of mistreatment and failure to follow state regulations which the Court has already dismissed for failure to state a claim. In this Order, the Court only addresses the cognizable retaliation claims identified in the screening order.

United States District Court
Northern District of California

(4) Plaintiff was signed up for one call on March 13, 2021, Dkt. No. 95-2 at 179; (5) from April 19, 2021 to May 3, 2021, Plaintiff signed up for nine phone slots, Dkt. No. 95-2 at 206; and (6) other phone lists indicate that Plaintiff used the phone six times in six days, Dkt. No. 95-2 at 90.

**1) Defendant Brewer**

In relevant part, Plaintiff alleges that defendant Brewer retaliated against him as follows. On January 20, 2021, Defendant Brewer interviewed Plaintiff regarding Grievance No. 29307. Defendant Brewer asked if Plaintiff had anything additional to add. Plaintiff responded that defendant Lee continued to obstruct Plaintiff's phone access and that Plaintiff was unable to make late calls. Defendant Brewer responded by threatening to prohibit Plaintiff from making calls during work hours, falsely claiming that prison records logged Plaintiff as having worked 168 hours in November 2020 and 140 hours in December 2020. Plaintiff told Defendant Brewer that prison records indicated that the barber program had reduced its hours, that Plaintiff's trust account reflected payment for far fewer hours, and that defendant Brewer was in violation of prison regulations. Plaintiff's response appeared to anger defendant Brewer, and Defendant Brewer responded that "RCGP makes its own program," and threatened "Keep filing." Dkt. No. 1 at 17-18; Dkt. No. 89 at 9-10.

Defendant Brewer denies retaliating against Plaintiff for submitting grievances by restricting his phone access. Defendant Brewer states that he was not the staff member who would release Plaintiff from his cell to access the phone; that he never instructed other officers to deny Plaintiff phone access; that he never threatened Plaintiff that he could no longer make phone calls during work hours; that then-existing policies prohibited inmates from accessing the phones during their work hours; that he never singled out Plaintiff for any reason with respect to phone access; and that he never allowed favoritism to affect inmates' phone access. Brewer Decl. ¶¶ 6, 7, 13-15 (Dkt. No. 95-3 at 2-3).

**2) Defendant Cupp**

In relevant part, Plaintiff alleges that defendant Cupp retaliated against him as follows. On May 28, 2020, defendant Cupp told Plaintiff, "You want to file – no more phone calls during work hours and if you go to yard, you miss your call!" Defendant Cupp then told the other

correctional officers: "Listen up, from now on, no phone calls during work hours!" Plaintiff alleges that inmates were told that they would not be allowed to make phone calls during work hours because of Plaintiff's grievance activity, and that this restriction was enforced only against Plaintiff even though due to COVID restrictions his work hours were sharply reduced. Dkt. No. 1 at 12; Dkt. No. 89 at 12.

Defendant Cupp denies retaliating against Plaintiff for submitting grievances by restricting his phone access. Defendant Cupp states that he was not the staff member who would release Plaintiff from his cell to access the phone; that he never instructed other officers to deny Plaintiff phone access; that he never told other inmates that they would be denied phone calls during work hours because of Plaintiff's grievances; that then-existing policies prohibited inmates from accessing the phones during their work hours; and that he never allowed favoritism to affect inmates' phone access. Cupp Decl. ¶¶ 7, 9, 13, 15 (Dkt. No. 95-6 at 2-3).

**3) Defendant Davis**

In relevant part, Plaintiff alleges that defendant Davis retaliated against him as follows. On March 27, 2021, defendant Davis told the porters, within earshot of Section A inmates, "No more double calls – Lopez 602ed it." Dkt. No. 1 at 23; Dkt. No. 89 at 14.

Defendant Davis denies retaliating against Plaintiff for submitting grievances and states that he never told other inmates that they would not be allowed to have two calls twice a day anymore because of Plaintiff's grievance activity. Davis Decl. ¶¶ 9-10 (Dkt. No. 95-7 at 2).

**4) Defendant Hamner**

In relevant part, Plaintiff alleges that defendant Hamner retaliated against him as follows. Defendant Hamner denied or limited Plaintiff's phone access on June 2, 2020, June 3, 2020, January 17, 2021, January 24, 2021, February 7, 2021, February 10, 2021, February 28, 2021, and March 13, 2021. With respect to March 13, 2021, Plaintiff alleges that he was denied a morning call when all other inmates were afforded one. Defendant Hamner did so by requiring Plaintiff to choose between yard and phone while allowing other inmates to attend yard and make a phone call; having an inmate create a phone list but failing to give Plaintiff the priority access required by his privilege group; denying Plaintiff a call while affording other inmates multiple calls;

skipping Plaintiff for his call; and failing to release Plaintiff for his call. Defendant Hamner denied or limited Plaintiff's access to the shower on September 10, 2020; and denied or limited Plaintiff's access to the yard on June 2, 2020 and June 3, 2020. Dkt. No. 1 at 12-13, 17-18, 20-21; Dkt. No. 89 at 14-17.

Plaintiff identifies the following interactions as indicative of retaliatory intent. On June 2 and 3, 2020, defendant Hamner told Plaintiff that he had been instructed by defendant Cupp to make Plaintiff choose between yard and phone. On September 10, 2020, defendant Hamner loudly announced, while starting directly at Plaintiff's cell, "Because someone 602ed the phone, you won't be getting showers," and then did not conduct showers. Dkt. No. 89 at 14, 16.

Defendant Hamner denies retaliating against Plaintiff for submitting grievances. Hamner Decl., ¶ 10 (Dkt. No. 95-4 at 2). Defendant Hamner denies being instructed by defendant Cupp that Plaintiff must skip yard to use the phone, but states that if inmates' yard times were at the same time as their phone time, safety and security concerns generally required the inmate to choose one of the two. Hamner Decl. ¶ 7 (Dkt. No. 95-4 at 2). With respect to showers, defendant Hamner states that, for safety reasons, he could only release one or two inmates out of their cells at a time and inmates were not entitled to daily showers. Hamner Decl., ¶ 8 (Dkt. No. 95-4 at 2). With respect to yard, defendant Hamner states that he only released inmates to yard when it was possible, safe, and appropriate, and that he generally enabled inmates in the same designated group to go to the yard together. Hamner Decl., ¶ 9 (Dkt. No. 95-4 at 2-3). Defendant Hamner further states that he never singled Plaintiff out for any reason when offering inmate access to phone, shower, or dayroom; and that he never allowed favoritism to affect inmate access to phone, shower, or dayroom. Hamner Decl. ¶¶ 13, 154 (Dkt. No. 95-4 at 3). Defendants also state that prison records establish that Plaintiff was signed up for a call on March 13, 2021 at 7:10 p.m. Dkt. No. 95-2 at 195.

**5) Defendant Lee**

In relevant part, Plaintiff alleges that defendant Lee retaliated against him as follows. Defendant Lee limited or denied Plaintiff's phone access on December 9, 2020, December 29, 2020, January 7, 2021, January 11-15, 2021, January 18, 2021, January 21, 2021, January 26,

2021, January 27, 2021, February 2, 2021, February 4, 2021, February 8-10, 2021, February 23, 2021, March 3-4, 2021, March 11, 2021, March 15, 2021, March 18, 2021, April 6-8, 2021, April 13, 2021, April 18, 2021, and May 3, 2021. Defendant Lee did so by refusing to give Plaintiff a call when other inmates were given multiple phone calls; cutting short Plaintiff's call on December 9, 2020; denying Plaintiff the opportunity to sign up for the early time slots that he was entitled to due to his privilege status and that he required due to his supporters' old age and other restrictions; skipping Plaintiff's cell when offering phone slots on a rotational basis; feigning being asleep when other inmates conveyed to him Plaintiff's desire to make a call; refusing to release Plaintiff for a call during a decent time; telling Plaintiff to wait until evening dayroom to make a legal call despite knowing that Plaintiff's attorneys would no longer be in the office at that time; requiring Plaintiff to choose between yard and phone access; offering Plaintiff calls when he knew Plaintiff could not connect; and ordering only Plaintiff back to his cell as the rest of his group was allowed out-of-cell time to shower, socialize, and make calls. Defendant Lee limited or denied Plaintiff shower access on January 27, 2021, February 4, 2021, March 18, 2021, April 8, 2021, and April 13, 2021. Defendant Lee did so by releasing all other inmates in Plaintiff's group for showers but ordering Plaintiff to return to his cell; and promising Plaintiff that he could shower after his medical appointment but then telling Plaintiff to take it home once Plaintiff returned from medical. During COVID, inmates were allowed daily showers, and Plaintiff did not have a shower on May 17, 2021. Defendant Lee limited or denied Plaintiff's access to dayroom on January 27, 2021, March 18, 2021, April 8, 2021, April 13, 2021, and April 21, 2021 by releasing all other inmates in Plaintiff's group for out-of-cell time to shower, socialize, and make calls, but ordering Plaintiff back to his cell. Dkt. No. 1 at 15-2; Dkt N0. 100 at 15.

Plaintiff identifies the following interactions as indicative of retaliatory intent. On December 29, 2021, defendant Lee told Plaintiff, "This is my program! Now you know I run it! Keep filing – all I have to do is offer you a call, or log that I did!" On December 31, 2021, Plaintiff filed a grievance, alleging that defendant Lee was obstructing Plaintiff's phone access by denying Plaintiff calls and allowing lesser privilege groups more phone slots than Plaintiff. A week after this grievance was filed, defendant Lee twice refused Plaintiff a call by skipping

Plaintiff's cell but offering other inmates phone slots on a rotational basis. On January 7, 2021, Plaintiff filed Grievance No. 76162, alleging that Plaintiff continued to obstruct his phone access. On January 20, 2021, defendant Lee told inmate Grajeda, "From now on, A-2-B calls will be limited because Lopez filed a 602." Defendant Lee also had Cell 205 tell Cell 101 that Cell 101 was A-2-B, meaning that Cell 101 would not be getting calls because of Plaintiff. The next day defendant Lee told many inmates that A-2-B calls would now be once per month because Plaintiff filed a grievance. On May 3, 2021, all inmates from Plaintiff's unit were afforded a call but Plaintiff. When Plaintiff informed defendant Lee that he wanted a call, defendant Lee responded by gesturing at Plaintiff with his middle finger and stating, "Fuck you! File on that!" Dkt. No. 1 at 15-18, 25; Dkt. No. 89 at 17-23.

Defendant Lee denies retaliating against Plaintiff for submitting grievances. Lee Decl., ¶ 6 (Dkt. No. 95-5 at 2). With respect to showers, defendant Lee states that, for safety reasons, he could only release one or two inmates out of their cells at a time and inmates were not entitled to daily showers. Lee Decl., ¶ 11 (Dkt. No. 95-5 at 3). Defendants further state that March 18, 2021 was not a regularly scheduled shower day for the unit, and Plaintiff was not entitled to a make-up shower that day because he had taken a shower the day before. Dkt. No. 95-5 at 197. With respect to dayroom, defendant Lee states that he only released inmates to dayroom, and allowed inmates to remain in the dayroom when it was safe and appropriate to do so under then-existing policies; that generally only a limited number of inmates were allowed to be in the dayroom at the same time; inmates were not entitled to be in the dayroom all day; and inmate access to the dayroom was limited by various factors. Lee Decl., ¶ 12 (Dkt. No. 95-5 at 3). Defendant Lee further states that he never singled Plaintiff out for any reason when offering inmate access to phone, shower, or dayroom; and that he never allowed favoritism to affect inmate access to phone, shower, or dayroom. Lee Decl. ¶¶ 13, 154 (Dkt. No. 95-5 at 2-3). Defendant Lee also states that, with respect to the December 9, 2020 phone call, Plaintiff's call was scheduled for 3:15 to 3:35 p.m., with another inmate scheduled for the 3:35 p.m. slot, and that Plaintiff's inability to have a 15-minute call was because he chose to start the call late despite being available at 3:15. Dkt. No. 95-2 at 223.



United States District Court
Northern District of California

**F. CDCR Administrative Grievance Process**

During the relevant time period,[2] the California Department of Corrections and Rehabilitation ("CDCR") provided inmates the following administrative remedy process for non-healthcare related issues. To dispute "a policy, decision, action, condition, or omission by the [California Department of Corrections and Rehabilitation] Department or departmental staff that causes some measurable harm to their health, safety, or welfare," the inmate was required to fill out and submit a CDCR Form 602-1 to his prison's Office of Grievances ("OOG") for a first level review. 15 Cal. Code Regs. §§ 3481(a), 3482(a). In the Form 602-1, the inmate was required to "describe all information known and available to the [inmate] regarding the claim, including key dates and times, names and titles of all involved staff members (or a description of those staff members), and names and titles of all witnesses, to the best of the [inmate's] knowledge." 15 Cal. Code Regs. § 3482(c)(2). The inmate was required to submit the claim within sixty calendar days of the claim being discovered. 15 Cal. Code Regs. § 3482(b). The OOG was required to provide the inmate with a written decision no later than sixty calendar days after the OOG's receipt of the grievance; with the decision clearly explaining the reasoning for the decision as to each claim. *Id.* at §§ 3481(a); 3483(i). The inmate could appeal the OOG decision by filing a written appeal with the Office of Appeals ("OOA") within sixty days of discovering the OOG decision. *Id.* at § 3484. A final decision by the OOA was required to exhaust an inmate grievance. *Id.* at § 3483(l).

**G. Plaintiff's Grievances**

Between June 6, 2020 and June 14, 2021, Plaintiff filed 34 grievances. Dkt. No. 95-2 at 82-85. After transferring to SQRC, Plaintiff filed 29 grievances between December 14, 2021 and March 28, 2024. Dkt. No. 95-2 at 82-85. In his complaint, Plaintiff reports filing forty-one

[2] The regulations that set out the features of the administrative remedies process for California prisoners underwent substantial restructuring in 2020, 2022, and 2024. Plaintiff argues that the prison regulations governing his grievances are the regulations in effect prior to June 1, 2020, as he was unaware of the revised regulations that took effect in June 2020 due to the closure of the law library during the COVID pandemic and prison officials' failure to inform inmates of the restructuring. Dkt. No. 100 at 73. However, this issue is moot because Defendants do not argue that Plaintiff's grievances failed to comply with prison regulations, either those in effect prior to June 2020 or after that date.

United States District Court
Northern District of California

grievances exhausting the claims raised in this action. Dkt. No. 1 at 1, 4-5. Of these forty-one grievances, Defendants report being able to locate thirty-eight of them. Ruhparwar Decl., ¶ 8 (Dkt. No. 95-2 at 2); Dkt. No. 95-2 at 82-85. Because there are a large number of grievances and each grievance is lengthy and detailed, the Court does not summarize the grievances here, but refers to the grievances in detail when necessary in discussing the exhaustion issue.

## DISCUSSION

### I. Plaintiff's Request for Spoliation Sanctions (Dkt. No. 89)

Plaintiff has requested that the Court grant a "spoliation order finding against Defendants and in [his] favor" that would make "all claims and inferences regarding inmate calls, yard and privilege status, as alleged in the Complaint, . . . determined in [his] favor and against Defendants." Dkt. No. 89 at 1-3. Plaintiff alleges that beginning in 2020, Plaintiff repeatedly notified Defendants and their agents, verbally and in his grievances and letters to the warden, that he intended to sue and that Defendants should preserve inmates' yard, phone, and shower records; the records of Global TelLink ("GTL"); and records related to the inmate witnesses' privilege group, assignment, and housing status. Plaintiff alleges that these records are necessary to refresh the memory of the inmate witnesses who were deposed; to impeach the inmate witnesses' false minimization of the number of calls that they made; and to generally support Plaintiff's claims. Dkt. No. 89 at 1-3.

Defendants oppose this request on the following two grounds. First, the GTL records were not destroyed; rather, Defendants did not attempt to locate the records because they are not relevant to Plaintiff's claims and because the Court ruled that the phone logs of other inmates are not relevant. Second, Plaintiff is not entitled to spoliation sanctions based on the failure to preserve records pertaining to other inmates' access to phones, showers, yard and these inmates' privilege group, assignment, and housing status because the Court has ruled that these records are not relevant. In addition, assuming arguendo that the requested records were destroyed, Plaintiff has not demonstrated that Defendants destroyed the evidence with the required culpable state of mind. Dkt. No. 94.

"Spoliation 'refers to the destruction or material alteration of evidence or to the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (citing *Silvestri v. Gen. Motors Corp.,* 271 F.3d 583, 590 (4th Cir. 2001)). Evidence of spoliation may be grounds for sanctions, which may include an adverse inference instruction. *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). To determine whether spoliation occurred, the majority of courts use some variation of the test set forth in *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 215 (S.D.N.Y. 2003). *See Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1133 (N.D. Cal. 2012). The *Zubulake* test has three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind;' and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Zubulake*, 220 F.R.D. at 220.

The Court DENIES the request for spoliation sanctions because Plaintiff has not satisfied either the second or third elements of the *Zubulake* test. Plaintiff has not presented any evidence that any failure to preserve the records was done with a culpable state of mind or that the records were "relevant" to his claims such that a reasonable trier of fact could find that it would support that claim or defense. Plaintiff sought these records in discovery. When these records were not produced, Plaintiff filed a motion to compel their production. Dkt. No. 57. In denying the motion to compel, the Court found that the records had limited relevance because they would not necessarily reveal anything about how Defendants treated other B-1 inmates. Dkt. No. 73 at 13-14. Accordingly, the Court finds that Plaintiff is not entitled to spoliation sanctions. *See Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 824 (9th Cir. 2002) (affirming district court decision that, under totality of circumstances, loss of slides did not warrant unfavorable inference because rational jury would not infer that loss of slides indicated that slides threatened defendants' legal position).

*Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 631 (C.D. Cal. 2013) (deletion of irrelevant evidence does not support a spoliation claim); see also *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 750 (S.D.N.Y. 2011) ("discovery sanction cannot be based on a failure to preserve irrelevant evidence").

## II. Motions for Summary Judgment

Plaintiff has filed a motion for summary judgment. Dkt. Nos. 88-89. In his summary judgment motion, Plaintiff describes actions taken by defendant Brewer on January 20, 2021; by defendant Cupp on May 28, 2020; by defendant Davis on December 10, 2020, February 7 and 27, 2021, March 20 and 27, 2021, and April 9, 2021; by defendant Hamner on March 13, 2021, June 2 and 3, 2020, September 10, 2020, January 17 and 24, 2021, February 7 and 10, 2021, March 13, 2021; and by defendant Lee on December 9, 2020, January 11-15, 18, 20, 26, 2021, February 2, 8-10, 23, 2021, March 3, 11, 15, 18, 2021, April 6, 7, 13, 21, 2021 where these defendants either denied Plaintiff phone time, priority to sign up for phone time, his preferred phone time, yard time, shower time, or out-of-cell time. Plaintiff alleges that Defendants "singled [him] out" and "likely" took these actions "because of [his] complaining;" that these actions would chill or silence a person of ordinary firmness; and that these actions did not advance any legitimate penological goals. *See generally* Dkt. No. 89.

Defendants oppose Plaintiff's summary judgment motion and seek summary judgment in their favor on two grounds. First, Defendants argue that certain claims should be dismissed for failure to exhaust administrative remedies. Second, Defendants argue that there was no retaliation as Defendants provided Plaintiff with phone, shower, and dayroom access in accordance with the applicable policies. *See generally* Dkt. No. 95.

### A. Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)). The nonmoving party must show more than "the mere existence of a scintilla of evidence." *In re Oracle Corp Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 252). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**B. Defendant Cross**

Plaintiff seeks summary judgment against defendant Cross. However, defendant Cross has not appeared in this action and has not been served with his summary judgment motion. The Court therefore DENIES Plaintiff's request for summary judgment against defendant Cross.

### C. Exhaustion

#### 1. Exhaustion Requirement and Legal Standard

The Prison Litigation Reform Act ("PLRA") sets forth the following exhaustion requirement: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is mandatory, *Jones v. Bock*, 549 U.S. 199, 211 (2007), and requires "proper exhaustion" of available administrative remedies, *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91. Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." *Jones*, 549 U.S. at 217–18.

"Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (alteration in original); *see also Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) ("The obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.' Once that is no longer the case, then there are no 'remedies . . . available,' and the prisoner need not further pursue the grievance.") (emphasis and alterations in original). "When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." *Andres v. Marshall*, 867 F.3d 1076, 1079 (9th Cir. 2017) (per curiam) (administrative remedies unavailable where prison failed to timely respond to inmate's grievance; inmate filed grievance in January 2013 and officials had not responded by December 2014, when inmate filed federal civil rights claim). To fall within this exception to the PLRA's exhaustion requirement, an inmate must show: "(1) that he actually filed a grievance or grievances that, if pursued through all levels of administrative appeals, would have sufficed to exhaust the claim that he seeks to pursue in federal court, and (2) that prison officials screened his grievance or grievances for reasons

inconsistent with or unsupported by applicable regulations." *Sapp v. Kimbrell*, 623 F.3d 813, 823-24 (9th Cir. 2010). A prisoner need not exhaust further levels of review if he has been reliably informed by an administrator that no more remedies are available. *Brown*, 422 F.3d at 935. If prison officials improperly screen out an inmate's appeals, the inmate cannot properly complete the grievance process and administrative remedies are effectively unavailable. *Sapp*, 623 F.3d at 822-23. Administrative remedies are effectively unavailable when prison officials decline to reach merits of a particular grievance "for reasons inconsistent with or unsupported by applicable regulations." *Id.* at 822-24.

Where a prison's grievance procedures do not specify the required level of factual specificity required in the grievance, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). The grievance should include sufficient information "to allow prison officials to take appropriate responsive measures." *Id.* (citation and internal quotation marks omitted). The grievance need not include legal terminology or legal theories unless they are needed to provide notice of the harm being grieved. *Id.* Nor must a grievance include every fact necessary to prove each element of an eventual legal claim. *Id.* The purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. *Id*.

The Ninth Circuit has adopted the "continuing-violations doctrine": "[W]e now hold that under the continuing-violations doctrine, a properly exhausted prison grievance asserting 'one, continuing harm or a single course of conduct' can exhaust events arising out of the same alleged violation that occur after the grievance was made." *Sheltra v. Jay Christensen*, 124 F.4th 1195, 1203 (9th Cir. 2024) (plaintiff's March grievance identifying threats from other prisoners was sufficient under continuing-violations doctrine to exhaust claims seeking relief for later-occurring attack in April because attack was part of same continuing harm previously grieved.)

Failure to exhaust under the PLRA is an affirmative defense that the defendant must plead and prove. *Jones*, 549 U.S. at 204, 216. The defendant's burden is to prove that there was an available administrative remedy and that the prisoner did not exhaust that available administrative

remedy. *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014). Once the defendant has carried that burden, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. *Albino*, 747 F.3d at 1172. But as required by *Jones*, the ultimate burden of proof remains with the defendant. *Id.* If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. *Id.* at 1166. But if material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts in a preliminary proceeding. *Id.*

**2. Analysis**

Defendants argue that the following claims should be dismissed for failure to exhaust administrative remedies: (1) Plaintiff's claims that Hamner denied or limited his phone access on January 17, 2021; January 24, 2021; February 7, 2021; February 10, 2021; and February 28, 2021; (2) Plaintiff's claims that Lee denied him a shower on January 27, 2021; February 4, 2021; April 8, 2021; and April 13, 2021; and (3) Plaintiff's claims that Lee retaliated against him by failing to release Plaintiff to attend dayroom and failing to allow him to remain out of his cell on January 27, 2021; April 8, 2021; April 13, 2021; and April 21, 2021. Defendants argue that while Plaintiff filed grievances exhausting the other incidents alleged in this action, these grievances did not reference the specific incidents identified above and therefore did not exhaust his claims regarding these incidents. *See generally* Dkt. No. 95 at 21-25.

Plaintiff argues that he is entitled to the application of the continuing violations doctrine and that pursuant to this doctrine, his numerous grievances adequately placed prison officials on notice that Defendants were unfairly denying him, or limiting his phone access, shower, dayroom, and out-of-cell time. Dkt. No. 100 at 6-8.

Defendants argue that the continuing violations doctrine is inapplicable here because Plaintiff's claims involve privileges that were denied pursuant to different policies and procedures. Specifically, Defendants argue that different policies governed access to phones, showers, and out-of-cell-time, and that between May 2020 and May 2021, different policies applied because of the

COVID pandemic.

Viewing the record in the light most favorable to Plaintiff, the Court agrees that Plaintiff's grievances exhausted the claims in this action under the continuing violations doctrine.

This action is similar to *Sheltra*, where the event that was the subject of the lawsuit was part of an ongoing course of conduct. In *Sheltra*, the prisoner-plaintiff filed a lawsuit alleging that prison officials failed to protect him from another inmate. Upon moving into unit D-1 on February 14, 2020, Sheltra immediately sent informal prison complaints to prison officials, requesting that he be moved to another housing unit because he was now being housed with an inmate who had previously threatened him, that he had been attacked the day prior, and that he feared being attacked again. On February 17 and 20, 2020, Sheltra filed additional informal prison complaints raising these concerns. On March 10, 2020, Sheltra filed a formal grievance regarding the issue. On April 17, 2020, Sheltra was severely beaten by an inmate, and Sheltra alleged that this inmate was ordered to attack him by an inmate that Sheltra had identified in his grievance. Prison officials argued that Sheltra had not exhausted his claims regarding the April 2020 assault because he did not file a grievance specifically regarding this assault. The Ninth Circuit held that Sheltra had sufficiently

> grieved a continuing harm or single course of conduct—prison officials failing to protect him from a specifically identified threat posed by inmates in his housing unit. While he referenced some discrete events and interactions in his inmate complaints, taken in context, they all related to a singular ongoing risk of harm. And his post-grievance attack likewise related to the same continuing harm that he previously grieved.
>
> . . . There would be little value in requiring Sheltra to separately grieve every new interaction or event related to the ongoing threats that he had already grieved because the purposes of exhaustion were satisfied. Defendants were made aware of the risk of harm that Sheltra claimed he faced and his contention that prison officials were failing to protect him, and they had a full opportunity, under the procedures adopted by the prison, to address Sheltra's concerns before this litigation was filed. *See Woodford*, 548 U.S. at 89, 126 S.Ct. 2378. Sheltra's informal and formal complaints also created a record to aid the litigation of his claim. *See Fuqua*, 890 F.3d at 844.

*Sheltra*, 124 F.4th at 1202-03.

Here, the record suggests that correctional officials did not strictly follow prison regulations governing access to phone, showers, dayroom, and yard, but rather ran these programs on an ad hoc basis. According to the record, at times, inmates were allowed to make multiple calls a day and to have both yard and phone calls in the same day. In addition, it appears that during

much of the relevant time period, Plaintiff was not working his job as a barber and therefore was able to make calls during what had previously been his work hours. The crux of Plaintiff's claims in this action is that, on the specific dates identified in his complaint, Defendants denied him a certain privilege while allowing other inmates the privilege and that the claim that the denial was due to prison regulations was pretextual. Plaintiff has attached 18 grievances as exhibits to his opposition. These grievances describe, in great detail, a single course of conduct from August 2020 to May 2021 where Defendants and certain other correctional officers regularly and arbitrarily denied Plaintiff access to phone, showers, dayroom, yard, or out-of-cell time, while affording access to other inmates.

With respect to defendant Hamner, the following grievances alleged that defendant Hamner regularly denied Plaintiff phone access solely to harass Plaintiff. In Grievance No. 29307, submitted on or about August 14, 2020, Plaintiff alleged that defendant Hamner was forcing Plaintiff and other inmates to skip non-conflicting yards in order to get a phone slot during Second Watch, despite prison regulations allowing for phone access during that time period. Dkt. No. 88-1 at 131-33. In Grievance No. 38759, submitted on September 10, 2020, Plaintiff alleged that defendant Hamner refused to follow the phone sign-up list on September 7, 2020; that defendant Hamner had inmates Newman and Raper prepare a phone list for September 10, 2020 in a manner that ensured that Plaintiff could not sign up for a phone slot during Second Watch; and that defendant Hamner's actions were retaliatory, racist, and contrary to prison policy. Dkt. No. 88-1 at 3. In Grievance No. 98722, submitted on March 14, 2021, Plaintiff alleged that on March 13, 2021, defendant Hamner refused to use a sign-up sheet and allocated phone slots by going down the tier; when defendant Hamner reached Plaintiff's cell, he told Plaintiff that he would receive his call after yard; when Plaintiff returned from yard, Plaintiff was denied a phone call for the morning time slot; all other inmates in Plaintiff's section were afforded a morning call; and defendant Hamner's actions were racist, prejudicial and unfair. Dkt. No. 88-1 at 13. Similar to *Sheltra*, Plaintiff's grievances referenced specific events that, taken in context, suggest an ongoing course of conduct by defendant Hamner. These grievances, spanning the time period of August 2020 to March 2021, suggest a consistent pattern of defendant Hamner denying Plaintiff phone

access without justification. These grievances therefore exhausted Plaintiff's claims that defendant Hamner denied Plaintiff phone access on various dates, including January 17, 2021; January 24, 2021; February 7, 2021; February 10, 2021; and February 28, 2021.

With respect to defendant Lee, the following grievances alleged that defendant Lee regularly denied Plaintiff various privileges, including shower access and dayroom access, solely to harass Plaintiff. In Grievance No. 76162, submitted on January 7, 2021, Plaintiff alleged that defendant Lee skipped over him when allocating calls; that defendant Lee threatened an inmate with loss of his phone access when the inmate pointed out that defendant Lee had skipped Plaintiff; that defendant Lee was repeatedly denying Plaintiff phone access; and when Plaintiff requested to see a sergeant to report defendant Lee's unfair treatment, defendant Lee refused to summon the sergeant. Dkt. No. 88-1 at 100. In Grievance No. 36291, submitted on February 3, 2021, Plaintiff alleged that, despite knowing that Plaintiff's supporters were only available for calls in the morning, defendant Lee allocated phone time in such a manner that the morning time slots were unavailable to Plaintiff; that defendant Lee told Plaintiff, "This is my program and I run it how I want to"; that defendant Lee told other inmates that because of Plaintiff's grievance activity, A-2-B inmates would only be allowed to have two calls a month; and that defendant Lee selectively dened calls during porter work hours in an attempt to pressure Plaintiff to stop his grievance activity because defendant Lee believed that one of the porters could influence Plaintiff's grievance activity. Dkt. No. 88-1 at 9. In Grievance No. 94646, also submitted on February 3, 2021, Plaintiff alleged again that defendant Lee was denying him phone access while allowing other inmates phone access, and that this was his sixth staff complaint against defendant Lee. Dkt. No. 88-1 at 123-24. In Grievance No. 95472, also submitted on February 3, 2021, Plaintiff alleged that defendant Lee forced Plaintiff to stay in his cell despite releasing the rest of his group for out-of-cell time and that his "complaint file shows similar acts [by defendant Lee]." Dkt. No. 88-1 at 213. In Grievance No. 88416, submitted on February 11, 2021, Plaintiff alleged that defendant Lee regularly denied him phone calls, both legal and personal, while offering phone calls to all other inmates; and that defendant Lee often allowed Plaintiff phone calls only during times when Plaintiff's supporters were unavailable. Dkt. No. 88-1 at 114. In Grievance No.

100554, submitted March 19, 2021, Plaintiff alleged that defendant Lee released five inmates for showers, but sent Plaintiff to medical and refused him a shower when he returned from medical. Dkt. No. 88-1 at 219. In Grievance No. 105977, submitted on April 7, 2021, Plaintiff alleged that defendant Lee continued to harass him and interfere with his court access by requiring Plaintiff to discontinue his legal call on April 7, 2021 while allowing other inmates to make multiple leisure calls, and by making Plaintiff choose between making a legal call and a personal call. Dkt. No. 88-1 at 177-78. Similar to *Sheltra*, Plaintiff's grievances referenced specific events that, taken in context, suggest an ongoing course of conduct by defendant Lee. These grievances, spanning the time period of August 2020 to April 2021, suggest a consistent pattern of defendant Lee denying Plaintiff various privileges, including shower access and dayroom access, without justification. These grievances therefore exhausted Plaintiff's claims that defendant Lee denied Plaintiff shower access on January 27, 2021; February 4, 2021; April 8, 2021; and April 13, 2021; and denied Plaintiff dayroom access or out-of-cell time on January 27, 2021; April 8, 2021; April 13, 2021; and April 21, 2021.

The Court therefore DENIES Defendants' motion for summary judgment for failure to exhaust administrative remedies.

### D. Retaliation Claim

#### 1. Legal Standard

Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, if the plaintiff's constitutionally protected conduct was a motivating factor in the adverse actions taken against him. *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted). The prisoner must show that the type of activity he was engaged in was constitutionally protected, that the protected

conduct was a substantial or motivating factor for the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological interest. *Hines v. Gomez*, 108 F.3d 265, 267–68 (9th Cir. 1997).

The adverse action need not be an independent constitutional violation. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).

The second element, causation, requires showing that the prison official intended to take the adverse action out of "retaliatory animus" to "silence and to punish" the inmate, as opposed to for some other reason. *Shepard v. Quillen*, 840 F.3d 686, 689-91 (9th Cir. 2016) (finding genuine issue of material fact as to whether defendant sent inmate to administrative segregation with intent to (1) follow 15 Cal. Code Regs. § 3335(a) or (2) retaliate for inmate's complaint about staff misconduct). Evidence probative of retaliatory animus includes proximity in time between the protected speech and the alleged adverse action, the prison official's expressed opposition to the speech, and the prison official's proffered reason for the adverse action being false or pretextual. *See id.* at 690. Retaliatory motive may also be shown by inconsistency with previous actions, as well as direct evidence. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003). Mere speculation that defendants acted out of retaliation is not sufficient. *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citing cases) (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to a prior lawsuit). "Prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right." *Bruce*, 351 F.3d at 1289 ("But, if, in fact, the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have arguably ended up where he belonged.").

With respect to the third element, prisoners have a constitutionally protected right to pursue civil litigation in the courts, *see Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995), and to seek relief using established prison grievance procedures, *see Bradley v. Hall*, 64 F.3d

1276, 1279 (9th Cir. 1995).

With respect to the fifth element, a plaintiff successfully pleads this element by alleging, in addition to a retaliatory motive, that the defendants' actions were unnecessary to the maintenance of order in the institution. *Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012).

**2. Analysis**

The parties do not dispute that Plaintiff's litigation and grievance activity constituted protected conduct; that denying an inmate privileges such as phone, yard, shower, and dayroom would be an adverse action that would chill an inmate's exercise of his First Amendment rights; and that telling other inmates that their access to phones or showers would be reduced because of the plaintiff's grievance activity would be an adverse action that would chill an inmate's exercise of his First Amendment rights. Defendants focus on the second and fifth elements of a First Amendment retaliation claim, arguing that any limitations placed on Plaintiff's privileges were dictated by security concerns and in accordance with prison regulations which prohibit phone access during work hours, limit inmates to one call a day, and prohibit inmates from making phone calls during yard. Defendants argue that Plaintiff was regularly provided phone access and that any denials of calls were likely because circumstances did not allow for a second call, or because the phone slots were taken by the time the officers rotated to Plaintiff's cell. Dkt. No. 95 at 26. With respect to defendants Brewer, Cupp and Davis, Defendants argue that if these defendants told Plaintiff that he could not make phone calls while he was working or that he needed to skip yard if he wanted to use the phone, or told inmates that there would be no double calls, these statements advanced legitimate penological goals because they were consistent with prison regulations. With respect to the phone claims against defendant Hamner, Defendants argue that (1) the records show that Plaintiff was afforded a call on March 13, 2021 despite his claim otherwise, and (2) with respect to the remaining dates, any limitations that defendant Hamner placed on Plaintiff's phone access were due to security and operating concerns, all of which pertained to legitimate penological goals. With respect to the phone claims against defendant Lee, Defendants argue that (1) Plaintiff's call on December 9, 2020 ended as scheduled at 3:35 p.m., and any reduction in his phone time was because he started the call late; (2) Plaintiff was afforded

United States District Court
Northern District of California

calls on January 7, 2021 and April 7, 2021, despite his claims otherwise; and (3) any limitations that defendant Lee placed on Plaintiff's phone access were due to security and operating concerns, all of which pertained to legitimate penological goals. With respect to Plaintiff's shower claims against defendants Hamner and Lee, Defendants argue that (1) defendant Lee denied Plaintiff a shower on March 18, 2021 because it was not a regularly scheduled shower day; and (2) any denials of shower time by defendants Hamner and Lee were due to security and operating concerns, all of which pertained to legitimate penological goals. With respect to Plaintiff's claims that defendant Lee refused to release him to dayroom or refused to allow him access to dayroom or out-of-cell time, Defendants again argue that any denials were due to security and operating concerns, all of which pertained to legitimate penological goals. *See generally* Dkt. No. 95 at 25-34.

Viewing the record in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to whether Defendants enforced the limitations on access to phone, yard, shower and dayroom in order to comply with prison regulations, or whether Defendants differentially enforced the limitations as to Plaintiff in order to punish him for his protected activity, and as to whether enforcement of the prison regulations served a legitimate penological purpose. While the restrictions placed on Plaintiff's access to phone, yard, showers, and dayroom complied with prison regulations, the record indicates these regulations were regularly disregarded, implying that compliance with these regulations was not necessary for institutional security and that their enforcement as to Plaintiff was retaliatory. In addition, during much of the relevant time period, Plaintiff was not working during what had previously been his work hours because the barber program hours were cut back due to COVID restrictions, meaning Plaintiff was now available for calls during work hours. And accepting Plaintiff's version of facts as true, Defendants sometimes referenced Plaintiff's grievance activity when enforcing these limitations.[3] Other times, these

[3] Defendant Cupp has denied telling other inmates that they would be denied work hours because of Plaintiff's grievances, and defendant Davis has denied telling inmates that they were not allowed to two calls a day because of Plaintiff's grievance activity. It is unclear why Defendants argue that Plaintiff will not be able to provide evidence disputing these denials. Plaintiff has alleged that he was present when defendants Cupp and Davis made these statements. Plaintiff's statements are based on his personal knowledge and consistent with his contemporaneous notes

United States District Court
Northern District of California

limitations were imposed in temporal proximity to Plaintiff's grievance activity. With respect to the claim that defendant Lee denied Plaintiff a shower on March 18, 2021, the parties' accounts of the relevant events conflict. Defendants allege that March 18 was not a regularly scheduled shower day and Plaintiff was not entitled to a makeup shower, yet Plaintiff alleges that defendant Lee offered showers to all inmates in Plaintiff's group, but sent Plaintiff to medical with the assurance that Plaintiff could shower upon his return. At summary judgment, the Court must assume the truth of Plaintiff's version of the events, which implies that, whether or not it was a regularly scheduled shower day, showers were offered to all inmates but Plaintiff. With respect to Defendants' claim that they are entitled to summary judgment with respect to the claims regarding denials of phone access on January 2, 2021 and April 7, 2021 by defendant Lee, and on March 31, 2021 by defendant Hamner, Defendants request summary judgment on the grounds that Plaintiff was able to make a call on those days. However, Plaintiff's argument is that other inmates were able to make multiple calls on those days, while he was not. A jury could reasonably find that despite being allotted a phone call that day, defendants Lee and Hamner's refusal to grant him an additional phone call was retaliatory and did not serve a legitimate penological purpose. Finally, the general statement that inmate access to phone, yard, showers, and dayroom is not unfettered and is subject to various factors, including safety and security concerns, fails to establish that on the specific dates identified by Plaintiff, Defendants enforced restrictions on Plaintiff's phone, yard, showers, or dayroom because of security concerns and not due to retaliatory intent.

The Court therefore DENIES Defendants' motion for summary judgment.

For the same reasons, the Court DENIES Plaintiff's motion for summary judgment. In considering Plaintiff's summary judgment motion, the Court must view the record in the light most favorable to Defendants and assume the truth of Defendants' statements. In doing so, there remain genuine disputes of material fact as to whether Defendants limited or denied Plaintiff's access to phone, yard, shower and dayroom in order to comply with prison regulations or to retaliate against Plaintiff, and as to whether enforcement of prison regulations served a legitimate

---

and contemporaneous grievances. Those statements are evidence. Whether Plaintiff's version of events will be convincing at trial is a separate issue for a later day.

penological purpose.

## III. Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts are not required to address the two qualified immunity issues in any particular order and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Defendants argue that they are entitled to qualified immunity because there is no clearly established law that failing to provide an inmate access to the shower or dayroom on one occasion amounts to a constitutional violation and because there is no clearly established law that complying with appliable prison regulations amounts to a constitutional violation. However, the constitutional question is not whether correctional officials can deny inmates shower or dayroom on a single occasion or whether correctional officials can enforce prison regulations. Rather, the constitutional question is whether correctional officials can deny or limit an inmate's privileges in retaliation for protected conduct. As discussed above, there are genuine disputes of material fact as to whether Defendants' actions were because of Plaintiff's protected conduct and as to whether Defendants' actions served a legitimate correctional purpose. Accepting Plaintiff's version of events as true and making all reasonable inferences in favor of Plaintiff, a jury could reasonably find that Defendants limited or denied Plaintiff access to phone, shower, dayroom, and yard in retaliation for his protected conduct and not because they were complying with prison regulations. At the time of the relevant events, *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995), had established that "the prohibition against retaliatory punishment [in the prison context] is "clearly established law" in the Ninth Circuit, for qualified immunity purposes," and *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003), clearly established that a government official may not use an

otherwise valid procedure as a ruse or cover to silence and punish an inmate.

Defendants are not entitled to qualified immunity based on the record currently before the Court.

**CONCLUSION**

For the reasons set forth above, the Court orders as follows.

1. The Court DENIES Plaintiff's motion for summary judgment, Dkt. No. 88; DENIES Plaintiff's request for spoliation sanctions, Dkt. No. 89; and DENIES Defendants' motion for summary judgment, Dkt. No. 95.

2. The case is hereby REFERRED to Magistrate Judge Robert Illman for settlement proceedings pursuant to the Pro Se Prisoner Mediation Program. Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Illman's calendar will permit. Magistrate Judge Illman shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon. The Clerk is directed to serve Magistrate Judge Illman with a copy of this order and to notify Magistrate Judge Illman that a copy of the Court file can be retrieved from the Court's electronic filing database.

3. In view of the referral, further proceedings in this case are hereby STAYED. If the case is not settled, the Court will enter a new scheduling order for further proceedings.

This order terminates Dkt. Nos. 88, 89, 95.

**IT IS SO ORDERED.**

Dated: 9/29/2026

Haywood S. Gilliam, Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge